IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JEANNIE L. COSBY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 5:09-CV-192 (CAR) |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Currently before the Court is the United States Government's Motion for Summary Judgment. [Doc. 43]. Plaintiff Jeannie L. Cosby filed suit against the Government, asserting claims arising from its alleged failure to provide recommended medical care and follow procedures for transfer, which, Plaintiff asserts, led to the amputation of half of her right foot. Plaintiff alleges that the Government was negligent based on the conduct of its employees, the United States Marshals Service ("USMS") and the Bureau of Prisons ("BOP"), pursuant to the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"). The Government has filed a Motion for Summary Judgment on grounds that it is immune from suit under the FTCA because the Irwin County Detention Center ("ICDC"), where Plaintiff was detained, is an independent contractor. The Government argues that there is no evidence that it received any

1

information about Plaintiff's condition after ICDC's initial medical request, and therefore it cannot be held liable. Having read and considered the arguments of the parties and the relevant law, the Court finds that there is no genuine issue of material fact as to whether ICDC was an independent contractor. However, the Government has failed to carry its burden under Rule 56 of the Federal Rules of Civil Procedure with regard to Plaintiff's underlying negligence action. Thus, the Government's Motion for Summary Judgment [Doc. 43] is **GRANTED in part** and **DENIED in part**.

## FACTS

The relevant facts in the light most favorable to Plaintiff are as follows: Plaintiff, Jeannie L. Cosby, is a Type II diabetic and is currently imprisoned in North Carolina after pleading guilty to federal charges. Between pleading guilty in the spring of 2007 and arriving at the North Carolina Correctional Institute for Women on January 14, 2008, where she now resides, Plaintiff was transferred to several detention centers around the country. Most relevant to this action, Plaintiff was transferred to ICDC in Irwin County, Georgia, on November 2, 2007. Plaintiff remained at ICDC until she was transferred to another facility on December 18, 2007.[1]  During her time at ICDC, Plaintiff was in the custody of the USMS.

---

[1] In a previous Order, the Court narrowed Plaintiff's cause of action to her FTCA claim arising out of her treatment at ICDC. See Doc. 7. Accordingly, this action considers the Government's alleged negligence only in regard to Plaintiff's time at ICDC.

Statutes and Regulations at Issue

Section 4042 of Title 18 of the United States Code outlines the duties of the BOP. Section 4042 provides, in relevant part that, "[t]he Bureau of Prisons, under the direction of the Attorney General, shall … provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2).

The duties of the USMS, however, are best explained by looking first at the relationship between the USMS and ICDC. The USMS housed Plaintiff at ICDC pursuant to an Intergovernmental Service Agreement ("Agreement"), a formal written contract between the USMS and ICDC. The Agreement provides that ICDC is responsible for the housing, care, and safekeeping of federal prisoners in exchange for a fixed per diem payment by the USMS for each prisoner held.

In part, the Agreement specifies that ICDC is responsible for costs of basic medical care that it is able to provide to USMS prisoners on-site. However, in the event that a medical condition requires outside treatment beyond basic medical care, the medical department at ICDC must request the USMS's authorization. The USMS must pre-approve all outside medical treatment for USMS prisoners, other than emergency care.

When the USMS determines whether it should approve medical treatment, it refers to USMS Directive 9.4: Prisoner Health ("Directives"). In short, these Directives outline the duties of the USMS with regard to the health of federal prisoners. In part, the Directives state that upon recommendation of a physician, the USMS will acquire and pay for "reasonable and medically necessary care" of a USMS prisoner. Doc. 48-6, p. 1. In most cases, the USMS must determine if the medical care is "reasonable and medically necessary" by considering listed criteria. Id. at 2. However, in some specific cases, the USMS has predetermined that certain conditions automatically require treatment, most relevantly: "limb-threatening" conditions and "chronic conditions … [that] if left untreated would likely lead to a significant loss of function or death." Id.

The Directives also provide several "Medical Clearance Requirements for Prisoner Movement or Transfer." Id. at 3. Among the requirements, the USMS district management must "review all USMS prisoner medical needs prior to placement at a detention facility," and "ensure proper arrangements are made to provide continuity of medical care for USMS prisoners." Id. at 3-4. Additionally, when transferring prisoners with "serious chronic medical conditions," the Directives provide that those prisoners "should be evaluated for transfer based on their medical needs and continuity of care requirements." Id. at 4.

George Lee Banks is the Supervisory Deputy U.S. Marshal for the Western District of North Carolina, assigned to the Asheville, North Carolina office. As Supervisory Deputy, Banks is in charge of the overall management of USMS District prisoners, including Plaintiff. In other words, Banks was in charge of the managerial aspect of Plaintiff's stay at and transfer from ICDC. In addition to ensuring that the District is abiding by the Directives, he also arranges prisoner transfer and approves outside medical treatment of USMS prisoners, both in accord with the Directives.

<u>Plaintiff's Detention at ICDC: November 2, 2007-December 17-2007</u>

On November 17, 2007, Plaintiff began experiencing severe pain in her right heel, similar to the pain that she had previously felt when she broke her left heel in March 2007. She informed ICDC that her foot may be broken and requested that she be seen by a doctor and have an x-ray taken of her foot. Because such medical services were outside of ICDC's available on-site care, ICDC sent the USMS an off-site medical request for its approval. Two days later on the 28th, Plaintiff's request was authorized by the USMS.

Plaintiff was seen by Dr. Howard McMahan on December 3. Although Plaintiff complained of pain in her right foot and heel, Dr. McMahan was also concerned with an

ulcer and callous that Plaintiff had on each of her fifth toes.[2]  An ulcer in a diabetic patient can develop by increased continuous pressure on weight bearing areas, leading to the death of tissue, or gangrene.  Osteomyelitis is an infection that can form in the bone surrounding the ulcer.  Most often when a patient develops osteomyelitis and gangrene, as was the case here, treatment requires amputation of the affected area.  Dr. McMahan testified that he was unable to determine the severity of the ulcer or when it had begun to develop at the time of Plaintiff's appointment.

In Plaintiff's medical report, which was part of her medical file that the USMS is directed to review prior to transfer, Dr. McMahan noted several assessments, including, "Diabetes mellitus type II" and "Abscess."  Doc. 52, Ex. 1, p. 2.  He also recommended a course of treatment that included taking x-rays of both of her feet, and a referral to Dr. Kramer, a podiatrist, to fit Plaintiff for diabetic shoes.  Diabetic shoes would relieve the pressure and friction on the ulcerated area of her foot, decreasing further damage and progression of her diabetic foot complex.  Additionally, Dr. Kramer would be able to more exactly determine the extent and severity of Plaintiff's ulcer.  Finally, Dr. McMahan ordered that Plaintiff come back for a follow-up appointment in one week.  Dr. McMahan's report does not indicate that the follow-up appointment was ever made.

---

[2] Plaintiff was presumably unaware of the ulcers on both of her feet at the time of her appointment. However, this is not unusual in diabetic patients due to the decreased sensation in the affected area.

On December 7, Plaintiff went to Irwin County Hospital to receive Dr. McMahan's recommended x-rays. Notably, the x-ray of her right foot taken at this time did not indicate any evidence of osteomyelitis, an infection in the bones surrounding the ulcer.[3] On December 18, 2007, more than ten days from the date Plaintiff's x-rays were taken; Plaintiff was transferred from ICDC to Paulding County Jail, another detention center presumably[4] with the same or similar Agreement with the USMS. Although Banks does not appear to have testified about the specifics of Plaintiff's case, he did state that generally when prisoners are transferred, his district performs an interview with the prisoner upon their admission to a new facility; however, his district does not do an "on-the-way-out medical evaluation." Banks Dep. 20:15-17.

Dr. McMahan ultimately never read Plaintiff's x-rays, nor did he see her in a follow-up appointment. Other than having x-rays taken, none of Dr. McMahan's recommendations were followed, including his recommendation that Plaintiff see Dr. Kramer who would be able to determine the severity and extent of her foot ulcer and fit her for diabetic shoes.

---

[3] However, osteomyelitis changes with the bone and may not be evident in an x-ray for several weeks. This was partly why Dr. McMahan recommended that Plaintiff see Dr. Kramer, as Dr. Kramer would likely determine the extent of her ulcer with greater certainty by performing an MRI or CT.

[4] Whether Paulding County Jail had an Intergovermental Service Agreement with the USMS is irrelevant to this Court's determination of this Motion.

After the initial diagnosis and recommendations were made by Dr. McMahan on December 3, 2007, Plaintiff was transferred to Paulding County Jail and later to the federal prison in Oklahoma City. On January 14, 2008, Plaintiff eventually returned to the North Carolina prison system and was no longer in USMS custody. Shortly after her arrival, doctors removed the front half of Plaintiff's right foot due to the osteomyelitis in the bones surrounding the deep ulcerative area that had developed into gangrene. Neither party disputes that the osteomyelitis and gangrene formed between Plaintiff's initial appointment with Dr. McMahan on December 3 and her arrival in North Carolina on January 14. More importantly, neither party disputes that her condition developed, at least in part, between Plaintiff's initial appointment and the date of her transfer from ICDC.

Plaintiff filed suit against the United States under the FTCA, alleging that the BOP and USMS were negligent for failing to review her medical file before transferring her from ICDC and, thus, failing to follow Dr. McMahan's recommendations.

## PROCEDURAL HISTORY

After Plaintiff's Administrative Claim was denied, she filed a *pro se* Complaint in this Court on June 8, 2009, alleging several different claims. Doc. 1. In a frivolity review, this Court dismissed her deliberate indifference claim against individual defendants at the Federal Medical Center-Carswell in Fort Worth, Texas, for lack of

8

personal jurisdiction.  Doc. 13.  Additionally, the Court dismissed Plaintiff's claims against the Burke County Detention Center, instructing her to refile those claims in the Southern District of Georgia, where Burke County is located.  Id.  However, the Court allowed Plaintiff's FTCA claim arising out of her detention at ICDC to remain, but substituted the United States as Defendant in lieu of the USMS and the BOP.  Id.

On August 4, 2010, the Court denied the Government's motion to dismiss, noting that Plaintiff's claim focused on "defendant, not ICDC or its personnel [being] ultimately responsible for her injuries."  Doc. 29, p. 2.  Thus, the Government's argument in its motion to dismiss and renewed argument in its reply, which focused on its immunity under the independent contractor exception, was largely inapplicable.  See Doc. 14.

Shortly thereafter, Plaintiff obtained counsel who filed an Amended Complaint.  Doc. 37.  In part, Plaintiff's Amended Complaint alleges that she has exhausted her administrative remedies as required by 28 U.S.C. § 2675.

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of material fact only

exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52. When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted). If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.

## DISCUSSION

Plaintiff alleges that the United States violated the FTCA because it breached its duties in 18 U.S.C. § 4042 and in the Directives. Specifically, Plaintiff contends that the Government failed to provide recommended medical treatment and failed to follow procedures required to transfer a prisoner.

The FTCA creates a limited waiver of sovereign immunity for claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). In its Motion for Summary Judgment, the United States asserts that there is no genuine issue of material fact regarding the Government's liability because ICDC is an independent contractor.

### A. Independent Contractor Exception

The Government bases almost all, if not its entire twelve-page Motion, on the applicability of the independent contractor exception to the FTCA. See 28 U.S.C. § 2671. Making the same argument that it submitted in support of its previous motion to dismiss, see Doc. 14, the Government argues that ICDC was an independent contractor, and therefore, not a federal employee. Considering that Plaintiff's claim is not about ICDC's negligence, but instead the *Government's* negligence, Plaintiff understandably concedes this argument. After reviewing the Agreement between the Government and ICDC, the Court concludes that there is no factual dispute as to whether ICDC is an

independent contractor in this case.  See Logue v. United States, 412 U.S. 521, 530 (1973) (relying on similar agreement to conclude that jail employees were independent contractors under the FTCA); Bailey v. U.S. Marshals Serv. Headquarters, 426 F. App'x 44, 46-47 (3d Cir. 2011) (same).  Accordingly, the Court finds that to the extent Plaintiff bases her claims on the negligence of ICDC, the Government's Motion for Summary Judgment [Doc. 43] is **GRANTED**.

### B. The Government's Negligence

Because the Government devotes its Brief to the independent contractor exception, the Government fails to even discuss the merits of Plaintiff's negligence claim, continually maintaining that it is immune from suit.  On summary judgment, the movant bears the burden of showing both that there is no genuine issue of material fact and that they are entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 323, 106 S.Ct. at 2553 (noting that the movant "bears the initial responsibility of informing the district court of the basis for its motion").  The party seeking summary judgment may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Here, the Court finds that the Government failed to carry its burden under Rule 56 as to Plaintiff's negligence claims. Indeed, even in its Reply, the Government fails to address the merits of Plaintiff's specific negligence claim that she raised in her Response. In light of this finding, the Government's Motion for Summary Judgment [Doc. 43] as to Plaintiff's underlying negligence claim against the USMS is **DENIED**.

In regards to the BOP's alleged negligence, it is unclear why the BOP's actions are relevant in Plaintiff's negligence claim as neither party indicates when, if at all, she was in the BOP's custody during her time at ICDC. Even more puzzling, both of the Government's briefs in support of its Motion focus specifically on the Agreement and the USMS's knowledge of Plaintiff's condition, disregarding Plaintiff's specific argument that the BOP was negligent for failing to comply with 28 U.S.C. § 4042. Similar to its finding above, the Court concludes that the Government failed to challenge the sufficiency of Plaintiff's underlying negligence claim against the BOP. Accordingly, because the Government fails to carry its initial burden on summary judgment, the Government's Motion for Summary Judgment [Doc. 43] with regard to the BOP's negligence is **DENIED**.

C. **Subject Matter Jurisdiction**

In reaching this decision, the Court questions *sua sponte* the propriety of its jurisdiction over this action. See Cadet v. Bulger, 377 F.3d 1173, 1179 (11th Cir. 2004)

13

(The Court is "obligated to inquire into subject-matter jurisdiction *sua sponte* whenever it may be lacking.").[5] The Court must consider "whether the plaintiff's negligence claims are barred by the FTCA's discretionary function or independent contractor exceptions [as they both] present[ ] a question of subject matter jurisdiction." <u>Cochran v. United States</u>, 38 F. Supp. 2d 986, 990 (N.D. Fla. 1998). The method of such a jurisdictional inquiry has been set out by the Eleventh Circuit: "First, are the alleged negligent acts or omissions discretionary functions which are immune from suit under the FTCA?  Second, if not, does FTCA's independent-contractor exception apply to insulate the United States against liability?  Third, if not, are the theories of liability asserted cognizable under the applicable state tort law?" <u>Dickerson, Inc. v. United States</u>, 875 F.2d 1577, 1580 (11th Cir. 1989).

Here, the Government failed to raise the discretionary function exception in its Motion for Summary Judgment. Indeed, a review of the record indicates that the Government has never asserted the applicability of the exception. The Court recognizes that this could very well be a calculated move by the Government. Nevertheless,

---

[5] Such an inquiry is considered a "factual attack" because the Court's jurisdiction is intertwined with the merits of Plaintiff's claim, specifically whether the discretionary function exception applies. <u>Lawrence v. Dunbar</u>, 919 F.2d 1525, 1528-29 (11th Cir. 1990); <u>Simpson v. Holder</u>, 184 F. App'x 904, 909 (11th Cir. 2006); <u>see also</u> <u>Brown v. Cranford Transp. Servs., Inc.</u>, 244 F. Supp. 2d 1314, 1318 n.2 ("The court may treat motions for summary judgment asserting a lack of subject matter jurisdiction as factual attacks on the court's subject matter jurisdiction.").

because the basic tenet of the exception mandates an inquiry into this Court's jurisdiction, the Court exercises its discretion to inquire about this matter.

Accordingly, the Government is **DIRECTED to file, within ten (10) days of the date of this Order**, a brief on the applicability, if at all, of the discretionary function exception to this case.  Plaintiff is **DIRECTED to file a Response, within fifteen (15) days from the date of the Government's filing.**

## CONCLUSION

In conclusion, the Government's motion for summary judgment is **GRANTED in part** and **DENIED in part**.  To the extent that Plaintiff's claims attempt to hold the Government liable for the negligent acts of ICDC, the Government's Motion for Summary Judgment [Doc. 43] is **GRANTED**.  To the extent that Plaintiff's claims assert negligence due to the Government's own actions, the Government's Motion for Summary Judgment [Doc. 43] is **DENIED.**  Additionally, the **Government is DIRECTED to file, within ten (10) days from the date of this Order**, a brief on the applicability, if at all, of the discretionary function exception.  **Plaintiff is DIRECTED to file, within fifteen (15) days from the date of the Government's filing**, a Response to the Government's brief.

**SO ORDERED,** this  6th day of February, 2012.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

LMH/aes/jlr